521-0217-WC, Linda Dawe, Appellant, v. Illinois Workers' Compensation Comm'n, Customs, Staffing, Industrial Services Appellee. Bruce Wessore is for the Appellant. Julie Webb is for the Appellee. Mr. Wessore, you may proceed. Thank you. May it please the Court, Ms. Webb, my name is Bruce Wessore and I represent Linda Dawe. This claim was denied by the arbitrator and then the Commission for one reason. Both, the evidence did not support deceased was exposed to the hazards of an occupational disease while employed by a respondent. Of course, it follows that if Mr. Dawe had no occupational exposure, he couldn't have developed an occupational disease related to his work and his death couldn't have been causally related to his employment. Mr. Wessore, could you turn up your speaker volume a little bit? Some of, or maybe it is, oh, that's it. That is better. Yes. Thank you. Thank you. Now, evidence was adduced at arbitration regarding exposure. The arbitrator waived some of it, and in its brief, the employer argued it. But it's the claimant's position that Mr. Dawe was exposed to the hazards of an occupational disease as a matter of law. The case that claimant relies on is a Supreme Court case of Thomas Leffler, which is cited in the brief. That case was the basis of Mrs. Dawe's argument at the commission and at the circuit court. Mr. Wessore, if I could reject the question to distinguish, isn't the case you're citing, wasn't the claimant in that case, in fact, employed as a coal miner? He was employed in a, he was a coal miner, and he was employed in an occupation or process in which the hazard exists, which is exactly what this man did. Well, let me stop you. Let me ask you this question. He was employed at custom staffing in human resources, technically, was he not? He was. He was the middleman between the miners and the mine management. Okay. So how did his occupational responsibilities or duties require him to go into a coal mine? Whether he went into the coal mine or not, I believe, is not the issue, according to Leffler. The issue is, did he work in an occupation where the exposure existed? Now, it's important to know what the place was that he worked in. He worked at custom staffing, and prior to that, for 35 years, he was a coal miner in a mine. And when he was working in the mine, he worked as a track layer, bottom laborer, deputy mine inspector, safety coordinator, and workers' comp manager, which is why a custom hired him. Now, when he was at custom, he served as the middleman between the miners and mine management. He met with the miners after their shifts, talking to them when they were covered with coal mine dust. Even Mrs. Higginson, his boss, admitted to those meetings and the fact that the miners were covered with dust. He worked in a building where the entrance to the mine was. He parked his car near the entry to the mine. He drove and parked his car, and he walked outside the building in near proximity to the belt, which carried the dusty coal from the mine to the power plant, which burned it, all on the same campus. He worked in an occupation or process in which a hazard of the disease exists. It would have been impossible for him to be on that campus, to work at the mouth of the mine, to work with miners coming out of their shift with coal mine dust all over their clothes, to be outside in the parking lot where the coal is carried by belt over to be burned at the power plant where there's wind, and not have been actually exposed to coal dust. And therefore, my answer to you, a long answer, I apologize for that. My answer is that yes, Leffler did not limit to actually being an underground coal miner or an aboveground coal miner. Leffler set the template for those who work in an occupation where the hazard exists, and there can be no question. And I don't even think that custom staffing would say there was coal dust on the Prairie State campus. Well, I believe the Leffler case went on to find that there was actual exposure. Well, it was clear there was exposure with him. He was in a coal mine. This is something that I've argued for 30 years. 30 years ago, it used to be important. Before Leffler, it was important to what happened on his last day of employment. And at that point, the obvious became proved, and in my opinion, became a matter of law, which is that if you're on a coal mine for your employment, as this man was, you're going to be around coal dust. And more important than that, a coal miner or a person like Mr. Dahl, who worked in a coal mine environment, didn't work his whole career there. He worked 35 other years. And once you establish that there's any exposure at all for Mr. Dahl on the last day, which I think is a matter of law, then, as the prior case, Leffler said, how do you know which mine did he get the exposure in that caused the disease? Well, I think I think if I could, if I could, Mr. Resor, I think Leffler finds that exposure, pardon me, is critical to a finding of liability. In this case, we on this court here the term mobile office quite a bit. But this was a mobile office. This was not down in the mine. Is that right? So I guess the question is, if exposure was found in the Leffler case, what's the best argument that there was exposure here? First of all, he was not in a mobile office. What what Miss Higginson was saying was that he was a mobile worker. And he had a laptop, which is people use now instead of pen and pencil. So sometimes he'd be in a conference room. Sometimes he'd be sitting next to in the lunchroom with these workers. There was testimony that on occasion he would go underground. Why he went under where he went in a mine, I don't know. But he had to go wherever it was required for him to do his duty. And while he was working in management, while he was a safety officer of some kind, you have to understand a coal mine is a dangerous place. It's a contentious place. And when the miners come out and talk to you and say they're the skid loaders ran over a pallet of glue, and it's down there, and it's messing up the place and nobody will get rid of it. This man can't go to his employer or his mine manager and say, clean up that stuff. He's going to want to go down there and be sure it's there. And when he talks to management, he's going to have to be sure he's telling the right thing. So there's plenty of reason why this man would have had to go underground. Mr. Wessor, if I could try and call out the essence of the argument, is it that even if he didn't go into the coal mine at all, I suppose, he was exposed to coal dust, nevertheless, because of the workers, because of the entrance, because of the atmosphere. He wasn't required to go into the coal mine for the incident to be compensable, correct? That is correct, sir. Going into the coal mine just stiffens it. But you can imagine working in a building at the entrance to the coal mine, parking next to that, and they carried the coal by belt across the road from the producing coal mine to the power plant. And as you've seen, any windy day, it blows the dust off that coal. It gets all over whoever's out there. It gets on their cars. And so what you're looking at here in this remedial act is a person who worked for 35 years in the coal mine and now worked in this, where his exposure was obviously less, but it was existent and enough for him to be compensated for his injury. So Mr. Wessor, what if he only worked a couple of years in the coal mine and then 20 years later had the same fact pattern we say here? Would that person be entitled to recover? Yes, sir, if we had the same fact pattern that was here, because he was also tangibly, obviously physically exposed to coal mine dust. He couldn't get away from that. There's a picture in the evidence of the campus with the coal mine and the offices and the belt going across the road to where the power plant was. So this is a different case than a clerical worker or a person who's only in management who goes to an air-conditioned office, maybe off the campus. That's a different deal. This guy was on the campus. His work required him to interface with coal miners who the company admitted were covered with coal dust. And there is testimony that says he also had to go underground. I will tell you that he did not have as much exposure for custom staffing as he did in his other jobs when he went underground and worked at the face or wherever. But to do justice, you have to figure out, okay, the guy worked 35 years. Now he works custom staffing. Does that rule him out? And this works both ways, too, Your Honor. I've had a number of clients who worked 35, 40 years in Illinois coal mines. And then they went to Kentucky, because after they retired, they thought, well, after a few weeks, they thought, well, this is not right. And so they would go down there and take a test at the coal mine on the equipment, and that's enough exposure to do away with their Illinois claim. So I can see someone saying, boy, this is kind of rough on custom staffing. Well, it's rough on the other side, too. Just like there are many employees who have been hired as security guards, and the coal mine will say, all right, security company, we'll hire you. We'll give you the contract. But look, we've got a bunch of old guys who've been really faithful workers, and we'd like you to hire them first. Company says, okay, it's a big contract. And all this guy does is drive a pickup truck around the perimeter of the coal mine site. Coal mine didn't even operate anymore. We've had those cases, and the miner prevailed. Because there was some exposure, they were at a mine site. And that's critical in this case. He was at a mine. Those words are in the Loeffler case. He was working at a coal mine when he ended his employment. This man was working at a coal mine. In fact, I think, in going over these questions, very good questions, I think it would be almost impossible to imagine a guy in this circumstance to not be exposed. I think that proof would be very hard to make. And again, I want to go back to the fact that when we read words in a transcript, when we read them other places, pictures come to our mind. So when you see the words mobile office, office is what you're hearing. But mobile is the key word there. Mobile is the one that tells you, okay, this guy was all over. Where was he? He was wherever he had to be. To do what? To work with miners, to listen to their complaints, to figure out if they were true, and to express them to the mine management. So yes, I'm very comfortable with that saying that he was exposed and that Loeffler does apply. And let's work backwards from that. If Loeffler doesn't apply here, when do you stop backing away? If this is not so much, what about a guy that spends his last year in the wash house? He's in a room where there's water all over the floor. He's supposed to clean it up. Is that guy out? He's technically called a miner. You might also call this guy a safety manager. You might call him some type of management. But terminology of workers' jobs in a coal mine shifts from company to company. Freeman Coal, for instance, they talk about out-buy and in-buy. But in other companies, they talk about roof bolters, buggy runners, belt shovelers, specifically. Mr. Wozork, let me interrupt you here for a moment and ask a question. Is it true or is it not true that there are requirements that a mine permit measures of dust exposure in and around the mine? It is required to take those samples, yes, sir. And what's the scope and breadth of those samples? Those samples are required by federal law. No, I meant the taking of the samples. The samples are taken at different locations. They're taken for silica. They're taken for coal dust. They're taken now for other things, too. Is it a reasonable inference that we're talking about a campus, a campus that's connected with apparently a power plant, correct? Yes, sir. That's its purpose. Okay. So and the campus itself includes not only the entrance to the mine, underground mine itself, but also the conveyor belt system going to the power plant and presumably the buildings that are around the campus, right? Yes, sir. And is there anything in the record to suggest that there's only samples taken of quality in the mine down in the working face of the mine or is it taken elsewhere? I would have objected if that would have come up. It did not come up. I would have objected because those are federal regulations and not even all places underground are sampled. And the samples that come out are based on averages, not actual workplace. So the question isn't the degree of exposure. The question of your case is whether there was exposure. Yes, sir. Yes, sir. And the federal regulations are based on an assumption that a certain level of exposure is okay. Therefore, they would only examine or take the samples at places where that level may be exceeded. That level wouldn't be exceeded in this man's work. But that doesn't mean that for Illinois law, he didn't have exposure. The real question is, I'm sorry. Well, that was the question. It's the question of exposure. Yes, sir. There's a lot of difference between safety regulations of MSHA or the federal government and exposure requirements under Illinois law. And remember, the case here is not, what do we do with this guy who worked 35 years in an office or in the environment? He worked 35 years as a coal miner. He's sick. In fact, he got cancer and died, which we allege is related to it. But his last time was working for custom staffing. Okay. Mr. Rezor, your time is... No, it's not. Yeah. Excuse me. Let me switch the panels here. Your time is up, but you'll have time in reply. Thank you. Ms. Webb, unmute yourself, if you would, please. There. I apologize. Thank you. May it please the court, I'm Julie Webb on behalf of custom staffing. And what this case comes down to is what Mr. Rezor has discussed is the issue of exposure. But the issue of exposure, the standard of review here is whether the finding that Mr. Dahl was not exposed is against the manifest weight of the evidence. Leffler is not applicable to this case. Leffler was an issue of causation. In that case, Mr. Leffler had 33 years of coal mine employment. No issue that he worked 33 years as a coal miner in the coal mine and had the exposure. And what the court held there was that Mr. Leffler did not have to prove the duration or the amount of his exposure. But in this case, where exposure is a question of fact, and the industry or the Workers' Compensation Commission is charged with making decisions of fact, they've determined that there was no exposure here. So if I could ask a question, does the company dispute that the coal miners had coal dust on their clothes? I thought Mr. Rezor alluded to the fact that the company acknowledges that there was coal dust around there. I believe it was Ms. Higginson that testified that he would have met with the coal miners as they came out of the mine with their work clothes that would have probably been covered in coal dust. How can we conclude he was not exposed at all to coal dust? Pardon? How would we conclude that he was not exposed at all to coal dust? Well, again, that is a question of fact for the commission to determine. And the commission considered all of the facts and all of the evidence in this case, and made the determination that he was not exposed to coal dust. Ms. Higginson, were you surprised by those facts for us, Ms. Webb? Yeah. Pardon? Could you summarize those facts for us? The facts that he was not... No exposure. Well, there's obviously a dispute in the testimony as to whether he went underground. His wife testified that, yes, he did in this job, was required to go underground. Ms. Higginson testified that in this position, he would not have gone underground. If he would have had to go underground, he would have had to complete the training necessary for the safety training. And there's a certificate that would have been in his file, which was not there. His wife didn't know when he went underground, how often, or even the last time. So summarize it, so you've got a lot of ground to cover. That's a disputed fact. Right. That the commission found no underground exposure. Is that the conclusion they came to? Well, that's the assumption since they determined that there was no exposure. Obviously, I think if they would have determined that he had gone underground, that would be a different case because I think then the exposure issue would be different. So obviously, that's a disputed fact that the commission determined. As far as other facts regarding exposure, Ms. Higginson is the one who testified as to the on numerous occasions, talked about the cleanliness of the building. She did not have dust on her when she left the building. Her car was parked in the parking lot, the same area where Mr. Dahl would have parked, and her car did not have coal dust on it. She spoke of where he had would have parked, and it would have taken him, I think she said 30 seconds to get from his car into this enclosed building. And these are all facts that go to issue of whether or not there was exposure. And based on those facts, the commission made the determination that there was no exposure. Well, what is Ms. Higginson's position with custom staffing? What is her position? Um, she was an executive vice president. She was Mr. Dahl's supervisor. Okay, she acknowledged that he would be around coal miners that had coal dust on them, correct? Yes, yes, she acknowledged that. But that was part of his job was to visit with the coal miners. He was the liaison. I think someone mentioned he was the human resource officer there for custom staffing and the liaison between the miners and custom staffing. Ms. Webb? Yes. In your view, how did the commission deal with Mr. Rasour's argument that this mobile office, the laptop, this gentleman going out to where they have to find the coal workers and meeting them where they are, put the dust on them and everything else? How'd the commission handle that issue? Well, the commission, based on their finding that he had no exposure, I don't know that they directly addressed that. They summarized the facts as I have summarized them here today. And based on those facts determined that there was no exposure. Again, this just comes down to a manifest weight question. The speculation as to why he might have gone underground, Mr. Rasour raised, I think something about there had been a pallet of glue that he had to investigate. There's no such evidence in the record. It's pure speculation as to reasons that he might have needed to go underground. There's no evidence that he supported a finding that he actually went underground. The fact that he worked for 35 years as a coal miner before he came to the job at Custom Staffing is not relevant to his exposures at Custom Staffing. What we're looking at here is strictly whether he was going to look at the facts specific to each case. Mr. Rasour noted that in some cases where a security guard is employed on the coal mine site, former coal miner, that's what he maybe ends his career working as a security guard, or as I think he mentioned in the wash house. You've got to look at each case on a specific factual basis for that case to make the determination of exposure. What Mr. Rasour is asking this court to do is create a presumption that if a person steps on the coal mine property, then they're exposed to the hazards of an occupational disease. There is no such presumption in the act. If the legislature wanted that presumption, they could certainly create such a presumption as they have created other presumptions. Did an arbitrator in the ruling ever say anything about being exposed to other coal miners with coal dust? As I'm reading this, they concluded that he was not exposed to the hazards of an occupational disease while employed by a respondent. I don't see them addressing the evidence at all as to whether or not he was exposed in any other manner to coal dust. Maybe one moment. You're asking whether he specifically addressed about the being exposed to the coal miners. There's no such testimony that he was exposed to other coal miners who had coal dust on them. The arbitrator may not have specifically addressed that. I believe that is included in the findings of fact. I'm just trying to pin it down as a factual matter. I understand. That was certainly before the commission. I know that that's an issue that's been raised all along. We don't dispute that that was Ms. Higginson's testimony, that they would have had coal dust on their clothing. That certainly was in evidence for the arbitrator to consider. Did she actually say that he met with miners that had coal dust on them or did she say it was possible that he did? She said I believe that it was possible because what she said is he would have met with them after they came out of the mine. Certainly, they could have still been in their mining clothes at the time. Was there testimony by the claimant's wife regarding the state of his clothing before he went to work and when he came home? She testified that his clothing was covered in coal dust when he came home from work. Yes, there was testimony of that to that extent from his wife. Again, that's a factual determination for the commission on the credibility of the wife's testimony. Ms. Higginson also testified that she visited that office and that site a number of occasions and did not have coal dust on her when she left the site. Did she perform, is there any evidence in the record that she performed or is there evidence of record to lead one to conclude she performed the same duties as the claimant, decedent? There is not specifically as to why she was at the coal mine site or where she would have met with people. I don't think there's any evidence in the record that she would have met with coal miners. There was occasion she did underground at that site, but there's not any testimony in the record one way or the other where she would have actually met with the coal miners. I believe it's in the record that she was in the same, visited the same building where he worked in his mobile office, whether it was the conference room or the break room, that she was in that same building, but there's not any meeting with the coal miners. So really what we do know about her is that she works in a clean building somewhere on the campus site? She was, she does not actually work on that site full time. She's the vice president for custom staffing, which I honestly don't, can't tell you right now where their headquarters are, but Prairie State where Mr. Dahl was working was one of their provided employers, so it's not. So she would have been a supervisor, a visitor supervisor to the location? To the location where he was working, correct. Right, she was not there on a full-time full-time basis. She was wherever the, like I said, I can't tell you right now where custom staffing's headquarters is, but it's not the Prairie State mine where. Where is that mine located? Where is that mine located? Nashville or? It's in the Nashville, Oakville, yeah, Oakville area, Clinton County, so it's over in that region. Even, I would just like to point out, I think in our brief, you know, we stated that the issues were not reached on disease, causation, and that those are disputed issues to be determined by the commission, so that this case would have to be remanded. Upon further review since then, I believe that there, there is a basis that this can be affirmed, even if this court overturns the finding on exposure. As the case, and I can provide you with this, the citation to the case, which provides that the commission's decision can be affirmed if there's any legal basis in the record which would sustain that decision. And in this case, although there's obviously a medical dispute between the experts, the one thing the experts agree on in this case is any pulmonary disease that Mr. Dahl may have suffered was present before he started his work at Custom Staffing. Dr. Hauser and Dr. Lackey agreed on that, so even if the petitioner, Mrs. Dahl, is able to prove exposure, she's unable to prove causation in this case, as the evidence all agrees that the diseases were present prior to Mr. Dahl going to work for, for Custom Staffing. Again, I would just conclude by stating that the exposure is a factual issue to be resolved by the commission, and that there's sufficient evidence to support their decision, and we would ask that this decision be affirmed. Thank you. Before you, what, give us a rundown on sufficient evidence. Sufficient. There's sufficient, well, there's sufficient evidence to support the commission's finding that there was no exposure. There's, it's disputed, you know, about the, whether or not he was underground. Ms. Higginson's testimony, that it was a clean environment, she did not have dust on her. I mean, the, Mrs. Dahl's presented no evidence as to his exposure in the, on the site, other than the testimony that he went underground, and again, that's a, that's disputed as to whether he, he went underground, and, you know, based on, like I said, the finding of the commission, I would presume that they, they determined that they did not find that testimony credible. Thank you. Thank you. Thank you, Council. Mr. Rezor, you may reply. Thank you. Very conversation that's being had, the arguments that are being made are what give strength to the whole Loeffler case. Exposure at a coal mine near the end of a miner's career in various jobs becomes very difficult to prove. They don't take the measurements, as you're asking. Therefore, this, this template put forth by, by Loeffler is extremely important. It allows all the employers to know. An employer like Customs Staffing knows when it's going to hire some people, be careful when you're hiring 35-year miners. There may be something wrong with them, and you're going to end up holding the stick for that. The, and another topic that came up in Loeffler that, that Ms. Webb was just talking about is the medical significance of the exposure. One very important thing that came out in Loeffler is that the claimant does not have to prove the medical significance of that exposure. And exposure also deals with other areas of law. For instance, I have had miners that it made a whole bunch of difference whether his last day of work was on the 5th of June or the 1st of June. And what, because of statute limitations, you see. When would the, when did he have that last exposure? And so, in, I've had cases where it was the 5th of June because then he went back and cleaned out his locker. He'd been laid on, out, off on the 1st June, but he went on the mine site, cleaned out his locker, and left. That was all he did. But it was enough to change that date for the purpose of the statute of You say, if you were working in an occupation where the hazard exists, who can say that the hazard didn't exist at the Prairie State campus? It was all over. But sir, if I could interject a question. Ms. Webb's fallback position seems to be that even if the decedent had some exposure to coal dust, you can't prove a causal connection between that and his condition of well-being. Well, isn't it, wouldn't it be the case that the only thing he has to establish is exposure on the last day of work, regardless of which exposure, earlier mining or working for this particular respondent, was actually responsible for the underlying condition? Yes, sir. That is the heart of it. That is the heart of it, because you can't prove it. You've got a miner who's worked five different mines. The last time he worked as a security guard, which one did it? And the answer is, make it fair for everybody. It hurts some miners. It hurts some companies. But overall, it's the best way to do it, because when you back away and look at the big picture, as the Supreme Court did, as you do when you hear these cases, the first thing is, you've got the man, you've got the worker, what's wrong with him? Is there anything? And then how do we apply a law to him? And I'll go to Flynn or interstate scaffolding or beam and trucking. It's a remedial statute intended to provide financial protection for injured workers to be liberally construed to accomplish that objective. That is what underlies the Leffler decision that we don't have to prove medical significance. We just have to prove he worked. We don't even have to prove he's exposed on that last day, only that he worked in an Ms. Higginson. And she said, well, she didn't have coal dust on her car. I doubt that she parked it at the place where it's going to get the most dust, number one. Number two, I doubt that she'd be real happy about making that concession. But she did say, without equivocation, this man did talk to coal miners, she saw them, their clothes were covered with dust. That was his job. And also, in answer to Justice Hoffman's question, she didn't say it was possible. She said that was his job. He had those meetings, not just it was possible. You also have at a coal mine, different levels of exposure in different jobs. You have service workers, you have mechanics in the workshops. So that is why any exposure at all in that occupation where this person may be, is what rules the day. How do you respond, Mr. Ward, to Mr. Wazor, to the claimant's decedent's wife's testimony? I think that she said, in talking to her husband and seeing his clothes, he said, I went underground today for this or that. I talked to Larry, and he said that the equipment wasn't working. Well, I had to go down there and look before I went and talked to Bob and personnel and told them they've got to get down there and fix that. They had these conversations, which she related that he was underground. Now, she was asked, well, where was he underground? When was he underground? How often was he underground? She didn't know the answer to those. Okay, well, I'm specifically referring to, apparently, the state of clothing before going to work and coming home. Yes, she did say that, that on these days when he'd go underground, his clothes were covered with coal dust. He was exposed the same way a miner would be on those days. That testimony was there. Was that the testimony or was the testimony that when he came home, she always washed the clothing at both jobs? Well, I can't remember the exact testimony, but as best I can recall it, she was talking about he would come home, sometimes his clothes would be covered with coal dust. She didn't say every day, to my knowledge, and it wouldn't have been. I'm sure there were some days when he spent most of the time talking to management or going over records, but there were some days when he spent most of the time talking with the coal miners or maybe going underground to look. And one of the things I want to say is in those questions that she was asked at arbitration, where did he go? When did he go? How often did he go? None of those questions are relevant to say if, if he had any exposure for any time, however short. It doesn't make any difference where in the mine or what time of day or how often that day he went underground. Fact is, he did. And that testimony was not impeached. So as I see it in all these questions to Ms. Webb, the questions and the answers came out this way. It's a question of how much exposure, not if there was exposure. Are there any more questions? Well, I just had one. Mr. Resor, you just, if I may, thank you. Well, I think I've lost the point. I just was, I think I've lost the point. I'm sorry. Okay. No other questions? I have none. Okay. Well, thank you, Council, both for your arguments in this afternoon.